IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Auto Money North LLC, | ) | Case No. 7:23-cv-02952-JDA |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Darin Walters, Carla Walters, Timothy McQueen, Cecilia McQueen, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendants/Counter Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| State of North Carolina, | ) | |
| | ) | |
| Intervenor. | ) | |
| _____ | ) | |

This matter is before the Court on a motion to intervene by TitleMax of South Carolina, Inc. ("TitleMax"). [Doc. 96.] Plaintiff/Counter Defendant Auto Money North, LLC ("AMN") and Defendants/Counter Claimants Darin and Carla Walters (the "Walterses") and Timothy and Cecilia McQueen (the "McQueens") (collectively, "Borrowers") have filed responses opposing TitleMax's motion, and TitleMax has filed a reply. [Docs. 98; 99; 100.] The motion is ripe for review.

**BACKGROUND**

**North Carolina Statutes**

Several North Carolina statutes are relevant to this action, and the Court begins by identifying them. Part of the North Carolina Consumer Finance Act ("CFA"), *see* N.C.

Gen. Stat. §§ 53-163 et seq., North Carolina General Statute § 53-190 provides, in relevant part:

> (a) No loan contract made outside this State in the amount or of the value of twenty-five thousand dollars ($25,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 have been charged, contracted for, or received, shall be enforced in this State. This subsection, however, does not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds occur entirely outside this State.
>
> (b) If any lender or agent of a lender that makes loan contracts outside this State in the amount or of the value of twenty-five thousand dollars ($25,000) or less comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

N.C. Gen. Stat. § 53-190 (the "Extraterritorial Loan Provision"). Also part of the CFA, North Carolina General Statute § 53-166(d) provides, in relevant part, that

> [a]ny contract of loan, the making, servicing, or collecting of which violates any provision of this Article, or rule adopted under it, except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan.

Part of North Carolina's usury law, *see* N.C. Gen. Stat. §§ 24-1.1, et seq., North Carolina General Statute § 24-2.1(a)–(c) states:

> (a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.

2

> (b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.
>
> (c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

Finally, under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDPTA"), *see* N.C. Gen. Stat. §§ 75-1.1 et seq., North Carolina General Statute § 75-16 states that "if damages are assessed" for violation of the UDTPA, then "judgment shall be rendered . . . for treble the amount fixed by the verdict." Additionally, North Carolina General Statute § 75-16.1 states that "[i]n any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee."

Collectively, North Carolina General Statute §§ 24-2.1(a)–(c), 53-166(d), and 53-190 and the UDTPA, are referred to herein as the "North Carolina Statutes."

**The Loan Agreements**

AMN is a South Carolina limited liability company, and its affiliate, AutoMoney, Inc., is a South Carolina corporation. [Docs. 1 ¶¶ 1–2; 26 at 9.] Both have principal places of business in Charleston, South Carolina, and both are "regulated lending entities that make consumer loans . . . secured by vehicle titles" under South Carolina statutes and regulations. [Doc. 1 ¶¶ 1–3.] Borrowers are all residents of North Carolina. [*Id.* ¶¶ 5–6.] AMN alleges that on three occasions the Walterses "voluntarily traveled to [AMN']s store in Landrum, South Carolina for the purpose of negotiating, applying for, and accepting [AMN's] offer of a loan with a security interest in the title to [the Walterses'] vehicle as

3

borrower and co-borrower." [*Id.* ¶ 7.]  Additionally, on another occasion, Darin Walters made the same trip "for the purpose of negotiating, applying for, and accepting [AMN's] offer of a loan with a security interest in the title to [his] vehicle," and "Carla Walters was not a co-borrower on th[at] loan." [*Id.*]  Similarly, on December 13, 2019, the McQueens "voluntarily traveled to [AMN's] store in Fort Mill, South Carolina for the purpose of negotiating, applying for, and accepting [AMN's] offer for a refinance of a loan with a security interest in the title to [the McQueens'] vehicle. [*Id.* ¶ 10.]

The results of these trips were that in December 2019, the McQueens entered into a loan agreement with AMN secured by the titles to their vehicle [Doc. 1-6]; and in May 2021 and between February and May 2022, the Walterses entered into four loan agreements with AMN secured by the titles to their vehicles [Docs. 1-2; 1-3; 1-4; 1-5].[1] The Loans were all "high-interest loans" with annual rates ranging from 138.959% to 199.65%. [Docs. 1-2; 1-3; 1-4; 1-5; 1-6.]  As of the date of the Complaint, the McQueens had made payments totaling $28,090.39 during the life of their loan agreement, and the Walterses had made payments totaling $39,385.73 over the course of their four loans, with an unpaid balance of $9,345.98, for which Darin Walters is responsible. [Doc. 1 ¶¶ 8–9, 11; *see id.* ¶¶ 24–25.]

**The Bankruptcy Cases**

On December 2, 2022, AMN filed a Chapter 11 bankruptcy petition.[2]  *See In re: Auto Money North, LLC*, No. 22-03309-hb (Bankr. D.S.C.) ("Bankruptcy Action"); [Docs.

---

[1]  The five loans are collectively referred to herein as the "Loans."

[2] This Court may take judicial notice of the records in the records in court proceedings. *Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (explaining that courts "may properly take judicial notice of matters of public record"); *Colonial Penn Ins. Co. v.*

4

1 ¶¶ 21–26; 50-6]. Three days later, AMN filed a related adversary proceeding. *Auto Money North LLC v. Abernathy*, No. 22-80047-hb (Bankr. D.S.C.) ("Adversary Proceeding"). The complaint in the adversary proceeding (the "Adversary Complaint") alleges that although AMN's stores are in South Carolina, some of its loans have been made to North Carolina residents, and some of those have resulted in litigation against AMN and AutoMoney, Inc. Adversary Proceeding Doc. 1 ¶¶ 6, 7, 10, 20, 47, 48, 71. The Adversary Complaint names approximately 400 defendants (the "Adversary Defendants") and alleges that each is a North Carolina resident. *Id.* ¶ 6; Adversary Proceeding Doc. 1-1. It alleges that the Adversary Defendants traveled to a store location in South Carolina for the purposes of negotiating, applying for, and accepting an offer of a loan; that the loan agreements included a choice-of-law provision and a forum selection clause providing that South Carolina law governs; and that once the loans were extended, liens were recorded on vehicle titles with the North Carolina Department of Motor Vehicles. Adversary Proceeding Doc. 1 ¶¶ 7, 59–62, 64, 66. It alleges that the Adversary Defendants have brought claims in various forms that allege violations of the CFA, the UDTPA, and North Carolina usury law and that the crux of the claims is the Extraterritorial Loan Provision. *Id.* ¶¶ 76, 78–79. It also asserts that that Extraterritorial Loan Provision is inapplicable on its own terms insofar as AMN "is a licensed South Carolina title lender that does not (and has not ever) 'come[] into [North Carolina] to solicit or otherwise conduct activities in regard' to title loans as contemplated by the statute." *Id.* ¶ 81 (quoting N.C.G.S. § 53-190). The Adversary Complaint alternatively alleges that application of the

---

*Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the content of court records.").

Extraterritorial Loan Provision to AMN impermissibly regulates AMN's lending activities within South Carolina's boundaries, violating the United States Constitution's First Amendment, Due Process Clause of the Fourteenth Amendment, and/or Commerce Clause.  *Id.* ¶ 82.  The Adversary Complaint seeks declaratory relief concerning the application of South Carolina law, the enforceability of the loan agreements, and the unconstitutionality of application of the Extraterritorial Loan Provision to AMN, and also includes a breach of contract claim as to more than 40 defendants whose loans have current balances.  *Id.* ¶¶ 83–96.

In January and February 2023, the Walterses and Thomas McQueen filed proofs of claims in AMN's bankruptcy case for $61,047.18 and $74,999, respectively, based on alleged violations of the North Carolina Statutes.[3]  [Docs. 1 ¶ 21; 50-6.]  The proofs of claims sought four types of relief: "(1) trebled monetary damages in the amount of all loan payments made, (2) monetary damages for violating North Carolina's usury law, (3) voiding of the loan and forgiveness of unpaid amounts, and (4) attorneys' fees." [Doc. ¶¶ 21, 23.]  Both the Walterses and Timothy McQueen indicated that the claim amounts did not include interest or other charges; that they were based on the fact that AMN accepted, received, and/or continued to retain payments made by them; that they sought "a total amount not in excess of $75,000"; and that because AMN continued to accept, receive and/or retain payments, and repossess vehicles, they noted that their damages could increase in the future.  [Doc. 50-6 at 3, 6–7, 9, 11–12.]

---

[3] AMN alleges that Cecilia McQueen did not file a proof of claim, but it asserts upon information and belief that she is a necessary party to this action as a co-borrower on the relevant loan agreement.  [Doc. 1 at 6 n.1.]

6

In February 2023, the Adversary Defendants filed a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing all claims in the adversary proceeding or, in the alternative, for an order of abstention pursuant to 28 U.S.C. § 1334(c)(1) or, in the further alternative, for an order staying the adversary proceeding pursuant to 11 U.S.C. § 305(a).  Adversary Proceeding Docs. 16; 20.  AMN filed a brief opposing the motion.  Adversary Proceeding Doc. 22.  On March 28, 2023, the bankruptcy court granted the motion, concluding that the Adversary Complaint stated a claim for which relief could be granted but ruling that the court would abstain under 28 U.S.C. 1334(c)(1).[4]  Adversary Proceeding Doc. 24 at 9–17.

AMN initially appealed the abstention decision.  Adversary Proceeding Doc. 26.  However, on May 22, 2023, the parties jointly stipulated to voluntarily dismiss the appeal under Rule 8023 of the Federal Rules of Bankruptcy Procedure.  [Doc. 9-5.]  The bankruptcy court later dismissed AMN's bankruptcy case on AMN's motion on June 23, 2023.  Bankruptcy Action Doc. 1380.

**The Present Action and the State Actions**

AMN filed the present action the same day AMN's bankruptcy case was dismissed.  [Doc. 1.]  The present action alleges six claims, which can be categorized into three groups.  [*Id.*]  AMN first seeks a declaratory judgment that "South Carolina law governs the Loan Agreements and that the courts of South Carolina are the only proper venues for any disputes arising under the Loan Agreements" and that the North Carolina Statutes

---

[4] That provision provides: "Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."  28 U.S.C. § 1334(c)(1).

7

do not preclude enforcement of the Loans, at least in courts outside of North Carolina. [*Id.* ¶¶ 84–86.] In the alternative, AMN asks the Court to declare and issue corresponding injunctive relief that the North Carolina Statutes violate the Due Process Clause of the Fourteenth Amendment, AMN's right to free speech and association under the First and Fourteenth Amendments, the Full Faith and Credit Clause, and the Commerce Clause of the United States Constitution. [*Id.* ¶¶ 87–113.] AMN also brings a claim for breach of contract, seeking money damages "for all injuries sustained as a direct and proximate result of [Borrowers'] breaches or repudiation of the Loan Agreements." [*Id.* ¶¶ 114–19; *id.* at 34.]

Later on the same day that AMN filed the present action, the Walterses and 42 other plaintiffs filed suit in state court in Guilford County, North Carolina, against AMN and its affiliate, AutoMoney, Inc., alleging violations of the CFA and the North Carolina usury law, seeking treble damages and attorneys' fees under the UDTPA (the "*White* Case"). [Docs. 9-6; 19-1 at 16–17 n.3; 22 at 14.] Three days later, on June 26, 2023, the McQueens and 43 other plaintiffs filed suit in state court in Guilford County, North Carolina, against AMN and AutoMoney, Inc., alleging the same claims asserted in the *White* Case and also seeking treble damages and attorneys' fees under the UDTPA (the "*Moore* Case"). [Doc. 9-7.] The complaints in both the *White* Case and the *Moore* Case (collectively, the "State Actions") allege that "[e]ach [p]laintiff stipulates that he or she is not seeking, will not seek and will not accept damages in excess of $75,000.00." [*Id.* at 11; Doc. 9-6 at 10.]

In the present action, on July 30, 2023, Borrowers filed two motions to dismiss. [Docs. 7; 9.] In one motion, Borrowers requested that the Court dismiss the present action

8

with prejudice for failure to state a claim under the doctrine of collateral estoppel based on the prior abstention ruling in the adversary proceeding. [Docs. 7; 8.] In the other motion, Borrowers requested that the Court dismiss AMN's Complaint on abstention grounds. [Docs. 9; 9-1.]

Meanwhile, on September 14, 2023, the parties in the State Actions jointly moved the North Carolina Superior Court for an Order pursuant to Rule 2.1 of the General Rules of Practice of the Superior and District Courts recommending to the Chief Justice of the Supreme Court of North Carolina that the actions be designated as exceptional actions and assigned to Superior Court Judge Paul Ridgeway of Wake County, North Carolina, for further proceedings. [Doc. 82-1.] The Superior Court granted the motion, and on September 27, 2023, the Chief Justice entered an Order designating the actions as exceptional and assigning them to Judge Ridgeway. [Doc. 82-2.]

In the present action, the Honorable Joseph Dawson III denied both motions to dismiss on October 18, 2023. [Doc. 15.] To Borrowers' argument for abstention based on purportedly parallel state actions, Judge Dawson applied the *Colorado River* abstention doctrine, rather than the factors in *Nautilus Insurance Co. v. Winchester Homes Inc.*, 15 F.3d 371 (4th Cir. 1994), which apply when only declaratory relief is sought, because AMN states a good-faith and nonfrivolous cause of action for breach of contract in addition to claims for declaratory relief. [Doc. 15 at 3–6 & n.4 ("The Fourth Circuit has said, '*Colorado River*, not [*Nautilus*], must guide a court's decision to abstain from adjudicating mixed complaints alleging claims for both declaratory and nondeclaratory relief.' *vonRosenberg v. Lawrence*, 781 F.3d 731, 735 (4th Cir. 2015), as amended (Apr. 17, 2015). . . . [T]he only potential exception to this general rule arises

9

when a party's request for injunctive relief is either frivolous or is made solely to avoid application of the [*Nautilus*] standard.'" (third alteration in original)).] Judge Dawson concluded that abstention was not warranted under the *Colorado River* doctrine because the State Actions were not parallel to the present action given that—at the time of his ruling—nothing in the record showed that the State Actions raised the same legal issues as the present case. [*Id.* at 7–8.] In particular, Judge Dawson noted that there was no record in this Court of AMN having raised a defense or counterclaim for declaratory relief or breach of contract in the State Actions. [*Id.* at 8 & n.5.] Nonetheless, Judge Dawson "reserve[d] the right to revisit" the issue of whether the present case was parallel with the State Actions should circumstances change. [*Id.* at 8.]

Judge Dawson also rejected Borrowers' argument that collateral estoppel applied against AMN based on an abstention ruling in the Adversary Proceeding. [*Id.* at 1 n.1.] As to this issue, Judge Dawson explained that collateral estoppel is an affirmative defense and thus is not properly considered on a Rule 12(b)(6) motion, which is intended only to test the legal adequacy of the complaint. [*Id.*]

On November 1, 2023, Borrowers filed an Answer in the present action and asserted counterclaims alleging violations of the CFA and North Carolina usury law and seeking treble damages and attorneys' fees under the UDTPA. [Doc. 16.] Then, on November 8, 2023, Borrowers filed a "renewed motion for an order dismissing this civil action on abstention grounds or, in the alternative, staying this case." [Doc. 19.] To this motion, Borrowers attached motions to dismiss that AMN and AutoMoney, Inc. had filed in the State Actions raising all of the issues that AMN has raised in this case in support of its claims for declaratory relief. [Doc. 19-2.]

10

As that motion remained pending, on November 27, 2023, AMN filed a motion to dismiss Borrowers' counterclaims.  [Doc. 23.]  On January 4, 2024, the State of North Carolina filed a notice of intervention to defend the constitutionality of North Carolina statutes.  [Doc. 38.]  Borrowers then filed a motion to dismiss the Complaint for lack of jurisdiction on February 6, 2024, contending that the Court lacks both diversity and federal-question jurisdiction.  [Doc. 50.]

This case was reassigned to the undersigned on February 14, 2024.  [Doc. 51.]  The parties, including the State of North Carolina, filed responses, replies, sur-replies, and supplements to the then-pending motions.  [Docs. 22; 26; 37; 39; 40; 42; 46; 54; 57; 62; 64; 66; 69; 70; 83; 84.]  Additionally, with this Court's permission, on March 19, 2024, the State of South Carolina and Alan Wilson filed an amici curiae brief supporting AMN's motion to dismiss Borrowers' counterclaims, and on March 28, 2024, Borrowers filed a response to the amici curiae brief.  [Docs. 73; 75; 79.]

On June 11, 2024, this Court denied Borrowers' renewed motion to dismiss on abstention grounds or, in the alternative, to stay and also denied their motion to dismiss for lack of jurisdiction.  [Doc. 89.]  Regarding abstention, the Court concluded that even if the State Actions were parallel to the present case, the relevant factors did not support abstention.  [*Id.* at 24–29.]  Concerning jurisdiction, the Court concluded that it has diversity jurisdiction and, particularly, that the amount-in-controversy requirement is satisfied.  [*Id.* at 15–20.]

On July 1, 2024, TitleMax filed a motion to intervene in this action under Rule 24(b) of the Federal Rules of Civil Procedure.  [Doc. 96.]  TitleMax asserts that it is a South Carolina title-secured lender that has recently been sued by its own borrowers under the

11

same allegedly unconstitutional statutes that are the subject of AMN's claims in the present case. [*Id.* at 1–2.] Accordingly, TitleMax argues that it faces constitutional questions identical with or similar to those in the present case. [*Id.* at 1–2.] In its proposed complaint in intervention, TitleMax seeks declaratory relief comparable to that sought by AMN.[5] [Doc. 96-1 at 21–22.] TitleMax argues that it meets the requirements for permissive intervention because it has a clear and direct interest in bringing questions of law that directly overlap with those raised by AMN in the present case; because TitleMax's motion to intervene is timely and will not prejudice the interests of the existing parties in the present case; and because this Court has independent diversity jurisdiction over TitleMax's complaint in intervention. [Doc. 96 at 2–3, 7–12.]

As noted, AMN and Borrowers oppose TitleMax's motion. [Docs. 98; 99.] They argue primarily that the motion is untimely, given that the case had been pending for more than one year before TitleMax sought to intervene, TitleMax had been aware of the case since shortly after its commencement, and the case had already reached an advanced stage by the time TitleMax moved to intervene. [Docs. 98 at 6; 99 at 8–10.] Even assuming arguendo that the motion was timely, the parties argue that permitting intervention would pose a substantial risk of prejudice and undue delay to the existing parties. [Docs. 98 at 6–7; 99 at 10–12.] They also contend that it would impermissibly

---

[5] The proposed complaint in intervention alleges claims against TitleMax's borrowers and the State of North Carolina for (1) declaratory judgment and injunctive relief under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (2) declaratory judgment and injunctive relief under the First and Fourteenth Amendments to the United States Constitution; (3) declaratory judgment and injunctive relief under the Full Faith and Credit Clause of the United States Constitution; and (4) declaratory and injunctive relief under the Commerce Clause based on the invalid extraterritorial application of the CFA. [Doc. 96-1 ¶¶ 53–79.]

12

expand the scope of the litigation to circumstances unique to TitleMax.  [Docs. 98 at 6–7; 99 at 13–18.]  For these reasons, AMN urges that TitleMax should assert its perspective through amicus participation rather than intervention and asks that, if the Court allows intervention, it sever TitleMax's claims after granting it.  [Doc. 99 at 18–20.]

On August 7, 2024, as the motion to intervene remained pending, AMN and Borrowers filed a joint motion to stay this action, indicating that they had "conducted a very productive mediation" the prior week, they had scheduled further mediation for August 16, and they believed this case might "well resolve itself in the coming weeks." [Doc. 104 at 1.]  The Court granted the motion, staying the case through August 19, 2024. [Doc. 107.]  On August 19, 2024, the parties filed another joint motion to stay, reporting that they had "agreed to a framework that would meet the goal of resolving this case as well as all or nearly all pending cases involving similar allegations against [AMN] as those made by [Borrowers] in their Counterclaims."  [Doc. 109 at 1.]  They indicated that although they were still working through some details, they believed "the most important terms for a settlement are now the subject of agreement" and they anticipated they would "resolve all or a substantial number of the remaining details within the next 60 days."  [*Id.*] Accordingly, once again, the Court granted the parties' joint motion to stay, and the Court denied without prejudice and with leave to refile AMN's motion to dismiss Borrowers' counterclaims if the parties failed to reach a settlement.  [Docs. 116; 117.]

On October 18, 2024, the parties filed a joint status report stating that the parties had executed a class action settlement agreement on September 24, 2024, and the North Carolina Superior Court for Guilford County had preliminarily approved the settlement agreement two days later.  [Doc. 119 at 1.]  They reported that that agreement would

13

resolve the present case, that a fairness hearing before the state court was scheduled for March 6, 2025, and that the agreement would take effect April 10, 2025, if approved. [*Id.* at 1–2.] Accordingly, the parties requested that the Court stay the present case for another six-month period. [*Id.* at 2.] The Court granted the motion and stayed the matter through April 18, 2025. [Doc. 121.]

## DISCUSSION

A party seeking to intervene under Rule 24(b) of the Federal Rules of Civil Procedure "may do so only upon the filing of a 'timely motion.'" *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014) (quoting Fed. R. Civ. P. 24). In determining whether such a motion is timely, the Court must consider three factors: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Id.* Based on consideration of these factors, the Court concludes that TitleMax's motion is untimely.

Regarding the first factor, by the time TitleMax sought to intervene, the proceedings in the present action had already reached a relatively advanced stage. The action had been proceeding for more than one year, during which the parties had fully briefed five motions to dismiss—four of which the Court had decided—and completed discovery. [Docs. 7; 8; 9; 11; 12; 13; 14; 15; 19; 22; 23; 26; 37; 39; 40; 42; 46; 50; 54; 57; 62; 64; 66; 69; 70; 72; 75; 79; 83; 84; 89.] The Court's scheduling order had been extended twice. [Docs. 45; 91.] The discovery deadline had passed, the deadline for mediation stood only one month away, and the deadline for summary judgment motions was about two months away, with the trial due to commence shortly thereafter. [Doc. 91.] Because the Court is "reluctant to arrest the momentum of the lawsuit so near to its final

resolution," this first factor weighs against allowing intervention. *Alt*, 758 F.3d at 591; *see Scardelletti v. Debarr*, 265 F.3d 195, 202 (4th Cir. 2001) ("The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal.") (internal quotation marks omitted), *rev'd on other grounds*, *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

The second factor—prejudice—also weighs against allowing TitleMax to intervene. TitleMax concedes, as it must, that "adding defendants (the TitleMax Borrowers) to the case might . . . occasion some limited threshold disputes," although TitleMax represents that it "is prepared to produce discovery on an expedited and abbreviated basis as necessary to move forward promptly." [Doc. 96 at 11.] TitleMax represents that AMN "agreed to TitleMax's motion to intervene and does not claim any prejudice related to TitleMax's intervention if granted." [*Id.*] However, as noted, AMN and Borrowers have filed responses opposing intervention. [Docs. 98; 99.] They argue that TitleMax's intervention would significantly delay the case. [Docs. 98 at 6; 99 at 10–13.] In particular, they note that, were intervention allowed, there would need to be discovery, at the least, with regard to TitleMax's as-applied challenges and its two new borrower parties. [Docs. 98 at 6–7; 99 at 13.] AMN raises the concern that permitting intervention could potentially "'open the floodgates' to additional title lenders as proposed intervenors." [Doc. 99 at 13; *see id.* at 14–15.] AMN also points out that TitleMax's standard agreements with its borrowers contain mandatory arbitration provisions that would lead to additional procedural motions practice. [*Id.* at 15–18.] And AMN notes that TitleMax makes claims against the State of North Carolina, which, at this point, is only an intervenor. [*Id.* at 10.]

15

An additional source of prejudice is that as a result of TitleMax's delay in seeking to intervene, the parties reached an agreement in principle to settle the case about a month and a half after the filing of the motion.[6] [Doc. 109.] "A settlement in principle raises a strong interest in finality." *Scott v. Bond*, 734 F. App'x 188, 191 (4th Cir. 2018). And, "intervention often is disfavored when it would disrupt a proposed settlement late in the litigation process, because such intervention may threaten the delicate balance reached by existing parties after protracted negotiations." *Id.* at 192 (internal quotation marks omitted); *see also Scardelletti*, 265 F.3d at 204 (explaining that danger that settlement might "unravel[]" can show prejudice). Such is the case here, and the Court concludes that the potential for prejudice in the form of delay and disruption of the parties' progress toward ending this litigation weighs against intervention.

Finally, the Court considers the soundness of the reasons offered by TitleMax for its delay in seeking to intervene. TitleMax does not deny that it learned of the present action shortly after it was commenced, but it asserts that it "wanted to confirm that the Court would exercise its jurisdiction over those claims presenting common questions of law as TitleMax's own claims, truly placing the parties at issue, before approaching the Court with an additional motion that might be rendered moot." [Doc. 100 at 7.] Evaluating a similar argument for delaying seeking intervention, the Fourth Circuit in *Alt* reasoned:

> Belying its late entry, CBF was not at all unaware of what was transpiring in the district court. Instead, [the proposed intervenor] candidly acknowledges that it had closely monitored the proceedings in Alt's lawsuit and made a strategic decision not to devote its 'limited resources' to the

---

[6] By the time TitleMax filed its motion to intervene on July 1, 2024, the parties had already scheduled mediation for July 30, 2024. [Docs. 93; 96.] As noted, the scheduled mediation was very productive and at a second mediation on August 16, 2024, they reached an agreement in principle. [Docs. 104; 109.]

16

>matter at an earlier stage, believing the court would grant the [defendant's] motion to dismiss. Stated plainly, [the proposed intervenor] admits that it gambled and lost in the execution of its litigation strategy. Such deliberate forebearance understandably engenders little sympathy. *See Moten v. Bricklayers, Masons, & Plasterers, Intern. Union of Am.*, 543 F.2d 224, 228 (D.C. Cir. 1976) (deeming motion to intervene untimely where decision not to seek earlier intervention was informed and tactical choice).

*Alt*, 758 F.3d at 591–92. Similar to the proposed intervenor in *Alt*, TitleMax's conscious decision to delay moving to intervene based on a gamble that events would render intervention unnecessary weighs against allowing intervention at this late point.

In sum, each of the three relevant factors weighs against granting TitleMax's motion to intervene. Accordingly, TitleMax's motion is denied.

## **CONCLUSION**

Based on the above, TitleMax's motion to intervene [Doc. 96] is DENIED.

IT IS SO ORDERED.

<u>s/ Jacquelyn D. Austin</u>
United States District Judge

February 27, 2025
Greenville, South Carolina